The Honorable Randy Laverty State Senator P.O. Box 303 Jasper, AR 72641
Dear Senator Laverty:
I am writing in response to your request for my opinion on a question I will paraphrase as follows:
 In light of the provisions of Act 1754 of 2003, which allow school districts to enter into public/private partnerships for the acquisition of facilities, does the Green Forest School District have authority to negotiate a lease-purchase agreement with a single contractor without reopening bids for a new facility since all of the earlier bids were over budget?
You report that the District electors approved a bond issue but that all of the bids on the project exceeded the bond proceeds.
RESPONSE
In my opinion, not under the circumstances as you have described them. Act 1745 authorizes entering into a public-private partnership only if the facilities bonds issued to finance the project were exempt from federal taxation pursuant to the provisions of 26 U.S.C. § 142(a)(13) in effect on January 1, 2003. The referenced federal statute deals only with state-issued facilities bonds, not with district bonds of the sort referenced in your request. Accordingly, I believe the District will be bound by the bidding procedure for awarding contracts set forth at A.C.A. § 22-9-203.
Act 1754 of 2003 added the following subsection (a)(1)(B) to A.C.A. §6-20-402 (Supp. 2003):
 School districts may enter into public-private partnerships whereby the school district enters into lease-purchase agreements for school buildings built by the private entities with facilities bonds exempt from federal taxes under 26 U.S.C. § 142[a](13), as in existence on January 1, 2003.[1]
Section 142 of title 26 of the United States Code provides in pertinent part:
 (a) General rule. — For purposes of this part, the term "exempt facility bond" means any bond issued as part of an issue 95 percent or more of the net proceeds of which are to be used to provide —
* * *
(13) qualified public educational facilities.
Subsection 142(k) of this statute, captioned "Qualified public educational facilities," provides:
 (1) In general. — For purposes of subsection (a)(13), the term "qualified public educational facility" means any school facility which is —
 (A) part of a public elementary school or a public secondary school, and
 (B) owned by a private, for-profit corporation pursuant to a public-private partnership agreement with a State or local educational agency described in paragraph (2).
 (2) Public-private partnership agreement described. — A public-private partnership agreement is described in this paragraph if it is an agreement —
(A) under which the corporation agrees —
 (i) to do 1 or more of the following: construct, rehabilitate, refurbish, or equip a school facility, and
 (ii) at the end of the term of the agreement, to transfer the school facility to such agency for no additional consideration, and
 (B) the term of which does not exceed the term of the issue to be used to provide the school facility.
 (3) School facility. — For purposes of this subsection, the term "school facility" means —
(A) any school building,
 (B) any functionally related and subordinate facility and land with respect to such building, including any stadium or other facility primarily used for school events, and
 (C) any property, to which section 168 applies (or would apply but for section 179), for use in a facility described in subparagraph (A) or (B).
 (4) Public schools. — For purposes of this subsection, the terms `elementary school' and `secondary school' have the meanings given such terms by section 14101 of the Elementary and Secondary Education Act of 1965 (20 U.S.C. 8801), as in effect on the date of the enactment of this subsection.
 (5) Annual aggregate face amount of tax-exempt financing. —
 (A) In general. — An issue shall not be treated as an issue described in subsection (a)(13) if the aggregate face amount of bonds issued by the State pursuant thereto (when added to the aggregate face amount of bonds previously so issued during the calendar year) exceeds an amount equal to the greater of —
(i) $10 multiplied by the State population, or
(ii) $5,000,000.
(B) Allocation rules. —
 (i) In general. — Except as otherwise provided in this subparagraph, the State may allocate the amount described in subparagraph (A) for any calendar year in such manner as the State determines appropriate.
 (ii) Rules for carryforward of unused limitation. — A State may elect to carry forward an unused limitation for any calendar year for 3 calendar years following the calendar year in which the unused limitation arose under rules similar to the rules of section 146(f), except that the only purpose for which the carryforward may be elected is the issuance of exempt facility bonds described in subsection (a)(13).
In my opinion, the statutory scheme set forth above envisions that only proceeds of bonds issued by the state will be used to finance school district improvements pursuant to a "public-private partnership agreement" as defined at 26 U.S.C. § 142k(2). I do not read these statutes as authorizing a public-private partnership agreement to undertake a project financed by the proceeds of local school district bonds of the sort the Green Forest School District apparently issued before the project was put out for bids. In my opinion, under the circumstances you have described, the District would be bound by the provisions of A.C.A. § 22-9-203 (Supp. 2003), which sets forth the award procedures for contracts to make public improvements. With respect to permissible procedures when all initial bids exceed available resources, A.C.A. § 22-9-203 provides as follows:
 (a) No contract providing for the making of major repairs or alterations, for the erection of buildings or other structures, or for making other permanent improvements shall be entered into by . . . any . . . school district . . . with any contractor in instances where all estimated costs of the work shall exceed the sum of twenty thousand dollars ($20,000) unless:
* * *
 (2) Any . . . school district . . . shall have first published notice of its intention to receive bids one (1) time each week for not less than two (2) consecutive weeks in a newspaper of general circulation published in the county in which the proposed improvements are to be made or in a trade journal reaching the construction industry.
* * *
 (f)(1) In the event that all bids submitted exceed the amount appropriated for the award of the contract and if bidding on alternates was not required by the plans and specifications, the county, municipality, school district, or other local taxing unit shall have the authority to negotiate an award with the apparent responsible low bidder but only if the low bid is within twenty-five percent (25%) of the amount appropriated.
 (2) If the plans and specifications for the project require bids on alternates in addition to a base bid, there shall be no more than three (3) alternates, and the alternates shall:
(A) Be deductive; and
(B) Be set forth in the plans and specifications in numerical order.
 (3) If all bids submitted exceed the amount appropriated for the award of the contract, then the county, municipality, school district, or other local taxing unit may determine the apparent responsible low bidder by deducting the alternates in numerical order.
 (4) After making the deductions, if the cost of the project is less than twenty-five percent (25%) above the amount appropriated, then and only in that event, the county, municipality, school district, or other local taxing unit may negotiate an award with the low bidder so determined.
* * *
 (h) For projects of this state or any agency of the state," amount appropriated" within this section means funds currently available for the project as determined by the state or any agency or department of the state or any county, municipality, school district, or other local taxing unit prior to the opening of any bids.
Applying this statute, I believe that if the above described process of negotiation does not result in an agreed price within 25% of available bond proceeds, the District would have no choice but to put the project, possibly in modified form, up for bids again.
Assistant Attorney General Jack Druff prepared the foregoing, which I hereby approve.
Sincerely,
MIKE BEEBE Attorney General
MB:JD/cyh
[1] In my opinion, the Arkansas statute recites the federal statute in effect on a specified date in order to avoid having an Arkansas law automatically track a federal law in whatever amended form it might take over time. As my predecessor discussed in Ark. Op. Att'y Gen. No.2001-035, directing that an Arkansas law will automatically incorporate federal law over time would in all likelihood amount to an unlawful delegation of the Arkansas General Assembly's legislative authority.